10-4029-cv
Bryant v. N.Y. State Educ. Dep't

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: October 21, 2011    Decided: August 20, 2012)

Docket No. 10-4029-cv

- - - - - - - - - - - - - - - - - - - - - - - - - x

**CHARLES BRYANT, individually and as next friend and guardian of D.B., AVA GEORGE, individually and as next friend and guardian of B.G., CHANIN HOUSTON-JOSEPHAT, individually and as next friend and guardian of A.J., LISA HUGHES, individually and as next friend and guardian of J.R., CARMEN PENA, individually and as next friend and guardian of G.T., VIVIAN PRESLEY, individually and as next friend and guardian of D.P., JAMIE TAM, individually and as next friend and guardian of S.T.,**

PLAINTIFFS-APPELLANTS,

- v. -

**NEW YORK STATE EDUCATION DEPARTMENT, DAVID M. STEINER, in his capacity as Commissioner of the New York State Education Department, THE NEW YORK STATE BOARD OF REGENTS,**

DEFENDANTS-APPELLEES.

- - - - - - - - - - - - - - - - - - - - - - - - - x

Before:       JACOBS, Chief Judge, WESLEY, Circuit Judge, and SULLIVAN, District Judge.[1]

_____

[1] The Honorable Richard J. Sullivan, United States District Judge for the Southern District of New York, sitting by designation.

Plaintiffs--the parents and/or legal guardians of seven children with disabilities, who bring this suit on behalf of themselves and the children--appeal the judgment of the United States District Court for the Northern District of New York (Sharpe, J.), dismissing their suit for failure to state a claim upon which relief can be granted, and denying their motion for a preliminary injunction. Plaintiffs seek equitable relief preventing New York from enforcing a prohibition on the use of aversive interventions, which are negative consequences or stimuli administered if a child's disruptive behavior impedes the child's education.

We conclude that prohibiting one possible method of dealing with disorders in behavior, such as aversive intervention, does not undermine a child's right to an individualized, free and appropriate public education, and that New York's law represents the State's considered judgment regarding the education and safety of its children that is consistent with federal education policy and the United States Constitution.

The judgment of the district court is affirmed. Judge Sullivan has filed a separate opinion in which he concurs in part and in part dissents.

2

Michael P. Flammia, Eckert Seamans Cherin & Mellott, LLC, Boston, MA. (Jeffrey J. Sherrin, O'Connell and Aronowitz, P.C., Albany, NY, and Meredith H. Savitt, Law Office of Meredith Savitt, P.C., Delmar, NY, on the brief), for Plaintiffs-Appellants.

Andrew B. Ayers, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Benjamin N. Gutman, Deputy Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, for Defendants-Appellees.

DENNIS JACOBS, Chief Judge:

Plaintiffs--the parents and/or legal guardians of seven children with disabilities, who bring this suit on behalf of themselves and the children--appeal a judgment of the United States District Court for the Northern District of New York (Sharpe, J.), dismissing their suit for failure to state a claim upon which relief can be granted, and denying their motion for a preliminary injunction. Plaintiffs seek equitable relief preventing the New York Board of Regents ("Board of Regents"), the New York State Education Department ("Education Department"), and the Commissioner of the Education Department (David M. Steiner, in his official capacity) from enforcing a prohibition on the use of aversive interventions. Aversive interventions are negative consequences or stimuli administered to children who exhibit

problematic and disruptive behavior that impedes their education.

Plaintiffs contend that New York's prohibition of aversive interventions undermines their children's right to a free and appropriate public education ("FAPE"), which is guaranteed by federal law. We conclude that the State's prohibition of one possible method of reducing the consequences of a child's behavioral disability does not undermine the child's right to a FAPE or prevent administrators from enacting an individualized plan for the child's education.

Plaintiffs also contend that the State's prohibition violates the children's constitutional rights and the Rehabilitation Act of 1973 because the prohibition is arbitrary and oppressive, the product of gross misjudgment by State policymakers, and an infringement on the individualized assessment and treatment of students with disabilities. We conclude that New York's law represents a considered judgment by the State of New York regarding the education and safety of its children that is consistent with federal education policy and the United States Constitution.

Affirmed.

**BACKGROUND**

**I**

The Individuals with Disabilities Education Act ("the IDEA") "is the most recent Congressional enactment in 'an ambitious federal effort to promote the education of handicapped children.'" Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d. Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 179 (1982) (interpreting the Education for All Handicapped Children Act, which was subsequently amended and renamed the IDEA)). The IDEA provides federal funds to states that "develop plans to assure all children with disabilities the right to a free appropriate public education." Id. (internal quotation marks omitted). The IDEA requires that each child receive, at least annually, an individualized education program ("IEP")[2] detailing "special education and related services" tailored for the particular needs of the child, 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the

---

[2] The IEP is "a written statement that [inter alia] 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)); accord 20 U.S.C. § 1414(d)(1)(A) (defining IEP).

child to receive educational benefits," Rowley, 458 U.S. at 207.

## II

The facts are taken from the well-pleaded factual allegations of the complaint, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007), and from information of which this Court can take judicial notice, see Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002) (determining that a reviewing court can consider the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and public records when considering a motion to dismiss).

Plaintiffs are the parents or legal guardians of seven children, each of whom has a long history of severe behavior problems, including aggressive, self-injurious, destructive, and non-compliant behavior. These behavioral disabilities cause the children to engage in behaviors such as: yanking out their own teeth, attempting to stab themselves, tying ropes around their necks, scratching themselves, banging their heads on walls and other things, and assaulting teachers and staff members. These behaviors have impeded their education and development.

Plaintiffs have tried a number of measures to treat and educate these children, including: special education, day

and residential programs, psychiatric hospitalization, counseling, physical restraints, paraprofessional support, home instruction, sensory tents, positive-only programs of behavioral modification, and anti-psychotic and other psychotropic medications.  None has been successful, and the children continue to pose physical risks to themselves and others.  As a result, they have been foreclosed from public schools and private institutions or confined in psychiatric wards and detention centers.  Each child's IEP now suggests they receive residential special-education services. Accordingly, each child is enrolled at the Judge Rotenburg Educational Center, Inc. ("JRC") in Massachusetts.

JRC provides residential, educational, and behavioral services to individuals with severe behavioral disorders, and is often a placement of last resort for those who have proven resistant to other forms of psychological and psychiatric treatment.  Although JRC is out of state, the children are permitted to attend under a New York law that allows New York students with disabilities who are unable to obtain an appropriate education in-state to attend an out-of-state facility that, in the judgment of the Education Department, can meet the needs of the child.  N.Y. Educ. Law §§ 4407(1)(a), 4401(2)(f), (h).

At JRC, each student starts with a non-intrusive, positive-only, treatment program in which students receive

7

rewards (e.g., treats, video games, music, field trips) for maintaining positive behaviors, including learning. The complaint alleges that these positive-only measures are effective for most of JRC's school-age students. For other students, JRC may also employ negative-consequence interventions known as aversives or aversive interventions.

According to the complaint, aversive interventions have been used to deal with behaviors that pose significant dangers to the student or others, or significantly interfere with a student's education, development, or appropriate behavior. The techniques aim to stop the behavior and thereby enable the student to receive an appropriate education, to enjoy safety and well-being, and to develop basic skills for learning and daily living. The complaint alleges that aversive interventions have helped many JRC students to participate in activities with peers and helped some to attend college, join the armed forces, obtain employment, and go on extended family visits.

The types of aversive interventions used by JRC include helmets with safeguards that prevent removal, manual and mechanical restraints, and food-control programs. But, according to the complaint, JRC's "principal form" of aversive intervention is electric skin shock, in which a low-level electrical current is applied to a small area of the student's skin (usually an arm or a leg). The shock

8

lasts approximately two seconds, and is administered, on average, less than once a week. The complaint alleges that severe problematic behavior decreases with this regime, thus alleviating an impediment to academic progress. Possible side effects include temporary redness or marking, which clears up within a few minutes (or a few days at most), and a rare occurrence of blistering.

Clinicians have opined that it is necessary to supplement these children's ongoing educational and treatment programs with aversives. However, none of the children has yet received an IEP that authorizes such interventions.

**III**

The Education Department, which is governed by the Board of Regents, regulates educational services and programs for New York residents. See N.Y. Educ. Law § 4403(3). It promulgates "regulations concerning standards for the protection of children in residential care from abuse and maltreatment," id. § 4403(11), and periodically inspects, reports on, and "make[s] recommendations concerning instructional programs or special services for all children with handicapping conditions who reside in or attend any . . . state financed . . . social service facilities, youth facilities, health facilities, [or] mental

9

health, mental retardation and developmental disabilities facilities," id. § 4403(4).

In 2006, the Board of Regents promulgated a regulation prohibiting schools, including "approved out-of-state day or residential schools" (such as JRC), from using aversive interventions. N.Y. Comp. Codes R. & Regs. tit. 8, § 19.5(b)(1) (2012). The regulation defines an "aversive intervention" as an intervention "intended to induce pain or discomfort to a student for the purpose of eliminating or reducing maladaptive behaviors," such as the contingent application of painful, intrusive, or similar stimuli or activity. Id. § 19.5(b)(2).[3]

---

[3] In full, the regulation defines "aversive intervention" as

an intervention that is intended to induce pain or discomfort to a student for the purpose of eliminating or reducing maladaptive behaviors, including such interventions as:
- (i) contingent application of noxious, painful, intrusive stimuli or activities; strangling, shoving, deep muscle squeezes or other similar stimuli;
- (ii) any form of noxious, painful or intrusive spray, inhalant or tastes;
- (iii) contingent food programs that include the denial or delay of the provision of meals or intentionally altering staple food or drink in order to make it distasteful;
- (iv) movement limitation used as a punishment, including but not limited to helmets and mechanical restraint devices; or
- (v) other stimuli or actions similar to the interventions described in subparagraphs (i) through (iv) of this paragraph.

N.Y. Comp. Codes R. & Regs. tit. 8, § 19.5(b)(2) (2012).

A child-specific exemption allows pre-approved aversives to be administered in exceptional cases in the three school years following the enactment of the prohibition (2006-2007, 2007-2008, 2008-2009), and a grandfather clause provides "that a student whose IEP includes the use of aversive interventions as of June 30, 2009"--three years after the enactment of the prohibition-- "may be granted a child-specific exception in each subsequent school year . . . ." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(e).

Neither exception applies to the children in the instant case because the initial three years of limited aversive interventions has now ended, and none of these children had an IEP that authorized aversives prior to June 30, 2009.

**DISCUSSION**

Plaintiffs raised below and press on appeal numerous challenges to New York's prohibition of aversive interventions and seek declaratory and injunctive relief preventing its enforcement. Specifically, Plaintiffs contend that New York's regulation violates: [1] the IDEA; [2] the Rehabilitation Act of 1973; and [3] the Due Process and Equal Protection clauses of the United States Constitution.

The district court granted Defendants' motion to dismiss all those claims for relief.  We review that decision de novo, "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff[s'] favor."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).  Although all factual allegations in the complaint must be assumed true for the purposes of a motion to dismiss, this principle is "inapplicable to legal conclusions" and "'formulaic recitation[s] of the elements of a cause of action.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2d Cir. 2009) (quoting Twombly, 550 U.S. at 555).  To survive a motion to dismiss, a complaint must allege "enough facts" to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible."  Twombly, 550 U.S. at 555, 570; accord id. at 555 n.3.

In addition to dismissing Plaintiffs' complaint under Rule 12(b)(6), the district court also denied Plaintiffs' motion for a preliminary injunction.  We review that ruling for abuse of discretion.  Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 664 (2004); Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005).  "A district court abuses its discretion when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision--though not

12

necessarily the product of a legal error or a clearly erroneous factual finding--cannot be located within the range of permissible decisions." Mullins v. City of New York, 626 F.3d 47, 51 (2d Cir. 2010) (internal quotation marks omitted; ellipsis in original).

I

A standing question has arisen. While this appeal was pending, the Massachusetts Department of Developmental Services promulgated a regulation that governs JRC (as a school in the Commonwealth), and bars it from using some aversives on these children and others.

The Massachusetts regulation, 115 Mass. Code Regs. 5.14 (2012), prohibits the use of certain aversive interventions--including "contingent application of physical contact aversive stimuli such as spanking, slapping, hitting or contingent skin shock," id. 5.14(3)(d)1.; see also id. 5.14(3)(d)--unless the child had a court-approved treatment permitting the use of aversives before September 1, 2011 (which none of the children at issue in this case had). The Massachusetts regulation permits other aversive interventions--including "[c]ontingent application of unpleasant sensory stimuli such as loud noises, bad tastes, bad odors, or other stimuli which elicit a startle response," and "delay of [a] meal for a period not exceeding

13

30 minutes," id. 5.14(3)(c)1.c.-d.--if they are contained in the student's written behavior modification plan and if that behavior modification plan meets certain special requirements. See id. 5.14(4)(c).

Because certain aversive interventions, such as the electric skin shock--the "principal form" of aversive intervention used by JRC--are no longer permitted in Massachusetts, Defendants contend that Plaintiffs' claims are moot. We disagree.

First, the question is not one of mootness. New York's prohibition on aversive interventions remains in effect and applicable to these children. Accordingly, the case and controversy is not moot. Cf. Lamar Advertising of Penn, LLC v. Town of Orchard Park, 356 F.3d 365, 375-76 (2d Cir. 2004) (explaining that, in the case of a statute or regulation, a claim usually becomes moot when a statute or regulation is amended).

The question is whether Plaintiffs retain standing, for which: [1] "the plaintiff must have suffered an injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; [2] "there must be a causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action of the defendant"; and [3] "it must be likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks, citations, brackets, and ellipsis omitted). Defendants contend that redressability has been foreclosed by Massachusetts' new regulation.

We conclude that a decision favorable to Plaintiffs would likely redress their injury for several reasons. First, if Plaintiffs prevailed, the children could receive the aversives that the new Massachusetts regulation continues to permit; whereas the New York regulation prohibits *all* aversives for these children, the Massachusetts regulation does not. Compare N.Y. Comp. Codes R. & Regs. tit. 8, § 19.5(b), with 115 Mass. Code Regs. 5.14(3)(c), (3)(d). True, electric skin shocks are the "principal form" of aversive interventions used by JRC; but if Plaintiffs prevail, the children may be able to receive other aversives at JRC.

Second, Defendants erroneously assume that if these children are unable to receive aversive interventions at JRC, they will be unable to obtain aversives anywhere. The complaint seeks an injunction preventing Defendants' from enforcing New York's prohibition on aversives and a declaration that the prohibition violates the U.S. Constitution and federal law. The prayer for relief is not

limited to treatment at JRC or in Massachusetts; JRC is not mentioned in the prayer for relief.

As all the parties concede, no facility other than JRC is *currently* treating New York children with aversive interventions. But this is hardly surprising since New York largely bans the use of aversive interventions. If New York's prohibition was declared invalid, it is "likely" that other facilities in New York would provide aversives. See Lujan, 504 U.S. at 561 (internal quotation marks omitted). It is also likely that these children could go to a facility in another state. See N.Y. Educ. Law §§ 4407(1)(a), 4401(2)(f), (h) (providing that New York students with disabilities who cannot obtain an appropriate education in New York may attend an out-of-state facility that the Education Department determines can meet the child's needs).[4]

Finally, Plaintiffs would have standing to challenge the New York prohibition even if, as Defendants argue, the

---

[4] A number of other states have substantially limited or outright prohibited the use of aversive interventions in schools and with students. See Cal. Educ. Code § 56520(a)(3); 22 Pa. Code § 14.133(e); Mont. Admin. R. 10.16.3346(4); N.C. Gen. Stat. § 155C-391.1(b)(2), (h); Nev. Rev. Stat. § 388.5265; Wash. Admin. Code § 392-172A-03125; 22 Va. Admin. Code. § 40-151-820; N.H. Code Admin. R. Ed. §§ 1113.04, 1113.06; D.C. Code §§ 38-2561.03(b)(1), 38-2561.01. However, there is no indication that these children would not be able to attend a school in some other state that could provide them aversive interventions, if necessary.

Massachusetts law would be an additional impediment to aversive interventions for these children.  First, Plaintiffs are prevented by issues of personal jurisdiction, service, and venue from challenging the Massachusetts and New York prohibitions in a single lawsuit; but their need to invalidate the Massachusetts regulation would not deprive them of standing to challenge the regulation in New York.  See Khodara Envt'l, Inc. v. Blakey, 376 F.3d 187, 194-96 (3d Cir. 2004) (as amended) (Alito, J.); accord Lamar Adver. of Penn, 356 F.3d at 374 (holding that the plaintiff had standing to challenge a law blocking its posting of certain advertising even though the plaintiff had not sought a permit, which was an additional impediment to the advertising).  Second, Plaintiffs' claimed injury is not (as Defendants contend) that these children are unable to obtain aversives generally, but rather that the New York prohibition prevents them from receiving aversives.  Viewed properly, Plaintiffs can obtain redress in this litigation: authority to obtain aversive interventions under New York law.  Accordingly, Plaintiffs continue to enjoy standing because a favorable judgment would make it "likely" that they could ultimately obtain the treatment they seek.  See Lujan, 504 U.S. at 561 (internal quotation marks omitted).

## II

Two types of claims lie under the IDEA: [1] a procedural claim challenging the State's compliance with the procedures set forth in the IDEA, and [2] a substantive claim challenging whether the IEP is reasonably calculated to enable the student to receive educational benefits.  See Walczak, 142 F.3d at 129.[5]  Plaintiffs assert both kinds of claim.

## A

Plaintiffs' procedural claim is that prohibiting aversive interventions prevents these children from obtaining a truly *individualized* education program because they are categorically barred from getting an IEP that

---

[5] An IEP sets out in writing, inter alia, (1) the child's present levels of academic achievement and functional performance; (2) the short-term academic and functional objectives; (3) the measurable annual goals for the child, including academic and functional goals; (4) the specific educational and related services to be provided to the child and the extent to which the child will be able to participate in general educational programs and curriculum; (5) the transition services needed for the child to leave the school setting; (6) the projected commencement for and duration of proposed services; and (7) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether academic and functional objectives are being achieved.  20 U.S.C. § 1414(d)(1)(A). The IEP is developed by a school official qualified in special education, at least one special education teacher, at least one general education teacher, other qualified individuals, the child's parents, and (where appropriate) the child.  Id. § 1414(d)(1)(B).

includes aversive interventions without regard to their individual needs. See D.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 511 (2d Cir. 2006) (explaining "that the right to a free appropriate public education [FAPE] is afforded to each disabled child as an individual").

Nothing in New York's regulation prevents individualized assessment or precludes educators from considering a wide range of possible treatments. The regulation prohibits consideration of a single method of treatment without foreclosing other options. In so doing, the regulation follows the goals and emphasis of the IDEA. See 20 U.S.C. § 1400(c)(5)(F) ("Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by . . . positive behavioral interventions and supports"); 64 Fed. Reg. 12406, 12589 (Mar. 12, 1999) ("[T]he primary focus must be on ensuring that the behavioral management strategies in the child's IEP reflect the [IDEA's] requirement for the use of positive behavioral interventions and strategies to address the behavior that impedes the learning of the child or that of other children.").[6]

---

[6] See also 20 U.S.C. § 1411(e)(2)(C)(iii) (allowing states to reserve federal funding "[t]o assist local education agencies in providing positive behavior interventions and supports"); id. § 1414(d)(3)(B)(i) (providing that the IEP team should "consider the use of positive behavioral interventions and supports, and other

Although the IDEA does not prohibit alternatives such as aversives, see 20 U.S.C. § 1414(d)(3)(B)(i), it cannot be said that a policy that relies on positive behavioral interventions only is incompatible with the IDEA.

Plaintiffs argue that, because the regulation eliminates one possible method from the students' IEP, it amounts to a predetermination that violates the procedural guarantees of the IDEA, as explained in Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840 (6th Cir. 2004). However, there is a distinction between a policy that affects individual cases on a categorical basis (such as the policy at issue here) and a local predetermination that rejects preemptively a measure that is permitted as a matter of state law.

In Deal, a school district refused to consider a particular teaching approach. Id. at 845-46. The Sixth Circuit concluded that foreclosure of a program without

_____

strategies, to address" "behavior [that] impedes the child's learning or that of others"); id. § 1454(a)(3)(B)(iii)(I) (allowing states to use federal grants to train educators in methods of "positive behavioral interventions and supports to improve student behavior in the classroom"); id. § 1462(a)(6)(D) (authorizing the Secretary of Education to enter into contracts with entities to ensure training in "positive behavioral supports."); id. § 1465(b)(1)(B)-(C) (permitting the Secretary of Education to support effective, research-based practices through training educators in "positive behavioral interventions and supports" and "effective strategies for positive behavioral interventions").

20

regard for its effectiveness was a procedural violation of the IDEA because it deprived the parents of meaningful participation in the IEP process. Id. at 857. We need not pass on the reasoning of Deal because unlike the instant challenge to a statewide prohibition enacted by a state government, Deal involved a challenge to an unofficial district policy involving a particular child's specific IEP as to which the parents had a statutory right of input, 20 U.S.C. § 1414(d)(1)(B).

The distinction is significant. See Alleyne v. N.Y. State Educ. Dep't, 691 F. Supp. 2d 322, 333 n.9 (N.D.N.Y. 2010) (distinguishing between authorities considering predetermination in IEPs and the promulgation of statewide regulations). "The IDEA was enacted to assist states in providing special education and related services to children with disabilities . . . not [to] usurp the state's traditional role in setting educational policy." Taylor, 313 F.3d at 776-77. "Congress did not prescribe any substantive standard of education" in the IDEA. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 65 (2d Cir. 2000). Instead, the IDEA "'incorporates state substantive standards as the governing federal rule' if they are consistent with the federal scheme and meet the minimum requirements set forth by the IDEA." Taylor, 313 F.3d at 777 (quoting Mrs. C. v. Wheaton, 916 F.2d 69, 73 (2d Cir. 1990)).

Moreover, Plaintiffs' interpretation of the IDEA would effectively strip state governments of the ability to adopt statewide policy because it is impossible to consider each student's circumstances before adopting statewide policy. For this reason, New York collects input--by parents, professionals, and the public--when the Education Department publishes a proposed regulation and an opportunity is afforded for notice and comment. See N.Y. State Register, Rule Making Activities, Nov. 15, 2006.

In this case, New York adopted the ban of aversives only after the Education Department made site visits, reviewed reports, and considered complaints from parents as well as school districts and others raising concerns about aversive techniques. Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006. It concluded that aversive interventions are dangerous and may backfire and that positive behavioral interventions are sufficiently effective to provide a FAPE. Id.

The prohibition therefore represents a considered judgment; one that conforms to the IDEA's preference for positive behavioral intervention. See, e.g., 20 U.S.C. § 1400(c)(5)(F). (Another such New York policy is the long-standing bar on corporal punishment. See N.Y. Comp. Codes R. & Regs. tit. 8, § 19.5(a).) The IDEA does not categorically bar such statewide regulations that resolve

problems in special education; otherwise, the IDEA would be transformed from a legislative scheme that preserves the states' fundamental role in education to one that usurps the role of the states. Cf. Rowley, 458 U.S. at 208 (explaining that "Congress' intention was not that the [IDEA] displace the primacy of States in the field of education, but that States receive funds to assist them in extending their educational systems to the handicapped").[7]

In sum, New York's regulation prohibits only consideration of a single method of treatment without foreclosing other options. Nothing in the regulation prevents individualized assessment, predetermines the children's course of education, or precludes educators from considering a wide range of possible treatments. Therefore, the district court correctly dismissed the procedural IDEA claim.

**B**

Plaintiffs contend that the prohibition on aversive interventions is a substantive violation of the IDEA because aversives are necessary to control the severe behavioral

---

[7] Plaintiffs direct our attention to Kalliope R. v. N.Y. State Dep't of Educ., 827 F. Supp. 2d 130 (E.D.N.Y. 2010), which concerned the State's foreclosure of a particular intensive teaching technique. Kalliope, however, is an interlocutory opinion, never appealed, that relied on Deal.

disorders that undermine the children's education. Plaintiffs allege that a positive-only program is effective with 70% of students but that each of these children fall within the 30% who are not sufficiently treated with positive-only interventions.

For many of the reasons discussed above, Plaintiffs cannot state a substantive IDEA claim. The prohibition on aversive interventions does not prevent these students from obtaining an IEP specifically aimed at providing them an appropriate education. Moreover, the Education Department has decided to focus its special-education programs on positive-only behavioral interventions, which is the clear (although not exclusive) methodology favored by the IDEA.

Even if we assumed that permitting these children to receive aversive interventions would help them fulfill their potential, Plaintiffs' substantive claim would still fail. The "IDEA does not require states to develop IEPs that 'maximize the potential of handicapped children.'" Walczak, 142 F.3d at 132 (quoting Rowley, 458 U.S. at 189); accord Rowley, 458 U.S. at 197-98 & n.21. The IDEA "guarantees" only that students with disabilities are provided an "'appropriate' education, not one that provides everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (internal quotation marks omitted). A state satisfies its obligation to provide a free

*appropriate* public education if it "provide[s] a disabled child with meaningful access to an education" even if the state "cannot guarantee totally successful results." Id. at 133 (citing Rowley, 458 U.S. at 192); accord Rowley, 458 U.S. at 195 (explaining that the IDEA "imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education").

Defendants provide these students with meaningful access to education opportunities by authorizing and funding their specialized education and behavioral modification treatment at an out-of-state residential facility that has expertise in treating children with severe behavioral disorders. Aversive interventions may help maximize the children's potential, but the IDEA does not require such measures.[8]

Moreover, we decline Plaintiffs' invitation to review and second guess New York's education policy. Although the IDEA provides for some judicial review, "the Supreme Court has cautioned[] . . . that this 'independent' review 'is by no means an invitation to the courts to substitute their own

---

[8] Significantly, none of these students received an IEP that authorized use of aversive interventions before the enactment of the regulation in 2006 or during the grandfathering period when a child-specific exception was available.

25

notions of sound educational policy for those of the school authorities they review.'"  See Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206).  We will not "simply rubber stamp" the decisions of the states and locals, but we must be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005) (internal quotation marks omitted); accord Rowley, 458 U.S. at 207 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States.").

There is an ongoing debate among the experts regarding the advantages and disadvantages of aversive interventions and positive-only methods of behavioral modification.  The judiciary is ill-suited to decide the winner of that debate. See Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003) (as amended) (reversing a district court decision finding IEPs inadequate because the district court "impermissibly chose between the views of conflicting experts on a controversial issue of educational policy").

Our deference to the Education Department's decision is further justified in this instance because New York adopted the regulation after the Education Department obtained information raising concerns regarding the potential health

26

and safety implications of aversives. See Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006. The Education Department was concerned that aversive interventions can result in "aggressive and/or escape behaviors" and can foster the development of "negative attitudes toward [one's] self and school programs," id.--concerns raised by reports and complaints by parents, school districts, and others. One such source of concern was a lawsuit alleging abuse at JRC, see Nicholson v. New York, 872 N.Y.S. 2d 846 (Ct. Cl. 2008), which prompted a site visit on which the Education Department "identified significant concerns for the potential impact on the health and safety of New York students," see Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006. This Court is not institutionally suited to now second guess the policy decision made by experts charged with formulating education policy in New York. See Cerra, 427 F.3d at 192.

Because Plaintiffs have not and cannot allege that these children have been deprived of a FAPE, they cannot prevail on their substantive IDEA claim.[9]

---

[9] The dissent concludes that a reasonable justification for preventing use of aversive therapies cannot be located in the record. We respectfully disagree. But even if there were no express justification, some justifications are implicit in the policy.

In addition to their procedural and substantive IDEA claims, Plaintiffs also assert a claim under the Rehabilitation Act.  Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege: [1] that he or she is a person with disabilities under the Rehabilitation Act, [2] who has been denied benefits of or excluded from participating in a federally funded program or special service, [3] solely because of his or her disability.  See Mrs. C., 916 F.2d at 74.  Plaintiffs, however, do not argue that the regulation banning aversive interventions denies them benefits on the basis of disability: The regulation applies to all students, regardless of disability.[10]

---

[10] Plaintiffs also cannot state a Rehabilitation Act claim for discrimination against people with disabilities who are students.  See J.D., 224 F.3d at 70.  Under the Rehabilitation Act, states receiving federal funds must "'provide a free appropriate public education to each qualified handicapped person.'"  Id. (quoting 34 C.F.R. § 104.33(a)).  This obligation can be satisfied by, inter alia, providing the student an IEP.  34 C.F.R.

Plaintiffs contend, however, that they state a claim under Rehabilitation Act because New York's ban on aversives was promulgated in bad faith or is the result of gross mismanagement. See Wegner v. Canastota Cent. Sch. Dist., 979 F. Supp. 147, 152 (N.D.N.Y. 1997) (relying on Brantley v. Indep. Sch. Dist. No. 625, 936 F. Supp. 649, 657 (D. Minn. 1996) (citing Monahan v. Nebraska, 687 F.2d 1164, 1170-71 (8th Cir. 1982))). We have never held that such a claim exists under the Rehabilitation Act, but even assuming that it does, Plaintiffs' complaint fails to state such a claim.

Plaintiffs' allegations of bad faith and gross mismanagement are refuted by the facts (of which we have taken judicial notice) that the Education Department [1] investigated the matter before offering the regulation for public comment and [2] received the public's comments before promulgating the regulation. See Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006; N.Y. State Register of Rule Making Activities, Nov. 15, 2006.

Plaintiffs' response that bad faith or gross mismanagement is manifest because there is no scholarly

---

§ 104.33(b)(1). As explained previously, the prohibition on aversives does not prevent educators from implementing IEPs for these children nor does it preclude their receipt of a FAPE.

support for banning aversives is similarly refuted by the Education Department's citation to scholarly literature discussing the dangers of aversives and the benefits of positive-only treatment. See Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006. In any event, such a dispute (regarding which education policy is the most scientifically sound and effective approach that is least likely to present health, safety, and moral and ethical concerns) is best left for resolution by the policymakers and education administrators, not the judiciary. See Cerra, 427 F.3d at 192; see also Rowley, 458 U.S. at 206-07; Walczak, 142 F.3d at 129.

**IV**

In addition to their statutory claims, Plaintiffs also contend that New York's prohibition of aversives deprives them of their constitutional rights to substantive and procedural due process and equal protection. Each claim is addressed in turn.

**A**

Plaintiffs contend that the ban on aversive interventions deprives these children of substantive due process. Plaintiffs cannot prevail on such a claim because

there is no substantive due process right to public education.

"[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Immediato v. Rye Neck Sch. Dist., 73 F.3d 454, 460 (2d Cir. 1996) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). In examining whether a government rule or regulation infringes a substantive due process right, "the first step is to determine whether the asserted right is 'fundamental,'"-- i.e., "implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition," Leebaert v. Harrington, 332 F.3d 134, 140 (2d Cir. 2003) (internal quotation marks omitted). Where the right infringed is fundamental, the regulation must be narrowly tailored to serve a compelling government interest. Immediato, 73 F.3d at 460. Where the right infringed is not fundamental, "the governmental regulation need only be reasonably related to a legitimate state objective." Id. at 461.

The right to public education is not fundamental. Handberry v. Thompson, 446 F.3d 335, 352 (2d Cir. 2006) (citing Plyler v. Doe, 457 U.S. 202, 221 (1982); San Antonio Indep. Sch. Dist. v. Rodriquez, 411 U.S. 1, 35 (1973)). Thus, even if Plaintiffs alleged that these children were

31

unable to receive a public education at all because they can no longer receive aversives, the bar on aversive interventions would still comport with due process if it was reasonably related to a legitimate government objective. The regulation rises to that low threshold because it serves a legitimate government objective: preventing students from being abused or injured by aversive interventions.

Realizing that there is no fundamental right to public education, Plaintiffs contend they have been deprived of the substantive due process because the ban on aversives is arbitrary and capricious (because, as Plaintiffs argue, aversives are effective and there is no scientific support for banning them).  This argument is addressed above. Moreover, we decline Plaintiffs' invitation to engage in policymaking decisions that are best left to the political branches.  See Cerra, 427 F.3d at 192.  In any event, safety and ethical concerns as well as the potential for abuse suffice to establish that New York's prohibition is not arbitrary and capricious--even if, as Plaintiffs contend, aversives are the best and, perhaps, only way to effectively treat these children's severe behavior disorders.

**B**

Plaintiffs' procedural due process claim largely duplicates the procedural IDEA claim and fails for the same reasons.

A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process. See Narumanchi v. Bd. of Trustees, 850 F.2d 70, 72 (2d Cir. 1988). As a general matter, Plaintiffs may have a property interest in public education. See Handberry, 446 F.3d at 353 (discussing New York law). The prohibition on aversives, however, does not prevent these children from obtaining a public education, even if, as Plaintiffs allege, these children would receive a *better* education if aversive interventions were permitted.

Instead, Plaintiffs contend that they have an interest in individualized assessments under the IDEA and that this interest is undermined by the prohibition on aversive interventions. This claim mirrors the procedural IDEA claim and fails for the same reason: Plaintiffs have not alleged that the prohibition on aversive interventions prevents an individualized assessment, education, or treatment of these children. The prohibition merely removes one possible form of treatment from the range of possible options. Each child is still able to receive an education plan that is tailored

33

to his or her specific needs in all other respects.

In addition, this claim fails because Plaintiffs do not possess a property interest in any particular type of education program or treatment.  See Handberry, 446 F.3d at 352.  Plaintiffs contend that their property right originates in the IDEA but, given the IDEA's strong preference for positive behavioral intervention, see, e.g., 20 U.S.C. § 1400(c)(5)(F), the IDEA does not create a property interest in the possible receipt of aversive interventions as part of an IEP.

C

Plaintiffs contend that the prohibition on aversive interventions violates equal protection by treating them differently than other students who had IEPs permitting them to receive aversives before June 30, 2009--the cut-off date for the grandfather clause.

Laws that discriminate on the basis of disability are subject to rational-basis review and upheld so long as there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose."  See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 109 (2d Cir. 2001).  And, as explained above, there is at least a rational basis to support the prohibition on aversives.

Plaintiffs' contention that the prohibition distinguishes between students with disabilities who had IEPs authorizing aversives prior to June 30, 2009, and students with disabilities who did not have IEPs permitting aversives, does not save the claim. Classifications that do not "proceed[] along suspect lines . . . must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Classification on the basis of authorization to administer aversive interventions in a student's IEP is, of course, a non-suspect classification subject to rational basis review.

Defendants' decision to grandfather the prohibition of aversives so that students already authorized to receive aversives could continue their treatment easily withstands rational-basis review. Grandfathering bans aversive interventions without interrupting education programs where aversives were already being used or already authorized to be used. It also avoids the tremendous labor of replacing the IEPs of all students who had IEPs authorizing aversives.

Plaintiffs argue that the exception authorizing some aversive interventions disproves that the ban was motivated by safety. Not so. Although it is true that an outright ban would better protect against any harms from aversives,

35

reducing the use of aversives can still provide a benefit by decreasing the number of students subjected to aversive interventions and the harms potentially associated with such interventions.

In the end, Plaintiffs' argument is that they disagree with Defendants' policy choice to ban aversive interventions. As long as Defendants had a rational reason, however, the prohibition must be upheld against an equal protection challenge. Here, the safety of the students coupled with an attempt to minimize the impact of the prohibition on students already receiving aversives provided a rational basis for the prohibition and the use of a grandfather provision to implement it.

V

Plaintiffs contend that the district court erred in denying their request for a preliminary injunction. Because the district court correctly dismissed the suit, it did not err in denying Plaintiffs' request for a preliminary injunction. See Monserrate v. N.Y. State Senate, 599 F.3d 148, 154 & n.3 (2d Cir. 2010) (holding that a party cannot satisfy the requirements for a preliminary injunction-- including "likelihood of success on the merits"--if that party cannot sustain any of its claims for relief).

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.

RICHARD J. SULLIVAN, <u>District Judge</u>, concurring in part and dissenting in part:

I concur in the majority's opinion with regard to Appellants' Rehabilitation Act, Due Process, and Equal Protection claims, but I respectfully dissent insofar as the Court's opinion relates to the dismissal of Appellants' IDEA claims because I believe that Appellants' complaint alleged sufficient facts to survive a motion to dismiss, and because I find that the materials outside the complaint relied on by the majority do not establish, as a matter of law, the reasonableness of the State's ban on aversive interventions.

In dismissing Appellants' complaint, the district court held that "the allegations demonstrate that the NYSED and the Board of Regents explored the available data, studies, and literature before making a reasoned decision that aversives should be generally prohibited." However, nowhere in the opinion did the district court actually cite from the pleadings to support this conclusion. Instead, the district court merely observed that "plaintiffs do not allege that [d]efendants did not <u>consider</u> the use of aversive interventions before adopting § 200.22" and then concluded

that "[t]he [c]ourt is not willing to second guess that policy decision." Id. (emphasis added).

While it is of course true that courts are not to second guess state authorities in matters relating to educational policy, the law is equally clear that federal courts may not merely "rubber stamp administrative decisions" of this kind. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005). Indeed, this Court has recognized that, notwithstanding "our deferential position with respect to state educational authorities crafting educational policy," "our review must be searching, and we must recognize that even when educational authorities act with the best intentions they may sometimes fall short of their obligations under the IDEA, and courts must then act to ensure compliance with Congress's directives." P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed., 546 F.3d 111, 120-21 (2d Cir. 2008) (internal citations omitted). This is particularly the case at the pleading stage, where a plaintiffs' allegations are presumed to be true. See Fed. R. Civ. P. 12(b)(6); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Here, the district court's conclusion that the prohibition of aversive

2

interventions was reasonable is particularly problematic, because Appellants alleged in their complaint that the scientific literature, which the district court mentioned (but did not cite) in its opinion, actually "supports the use of aversive interventions and their vital role in providing a FAPE to students with severe behavior disorders."

The majority affirms the district court's dismissal of Appellants' suit, finding that the prohibition of aversive interventions reflects "a considered judgment by the State of New York regarding the education and safety of its children that is consistent with federal education policy and the United States Constitution." In reaching this conclusion, the majority relies not on the pleadings or on the district court's opinion, but rather on four pages from the Education Department's Notice of Emergency Adoption and Proposed Rule Making, of which it has taken judicial notice. While the Court can certainly take judicial notice of facts, these four pages, standing alone, are insufficient to justify the district court's dismissal of Appellants' claims at this early stage of the litigation. Indeed, the first two of those pages simply note the Department's "concerns"

3

with aversive interventions based on "site visits, reports and complaints filed by parents, school districts and others," Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006; the latter two merely catalog scientific studies that purportedly support the proposed rule.

Importantly, the scientific studies summarized in the Notice of Emergency Adoption and Proposed Rule Making do not directly call for the prohibition of aversive interventions. To the contrary, these studies presuppose the use and utility of aversive interventions at least in certain contexts and merely set forth "standards" and "strategies to improve an ABI's [aversive behavioral intervention's] effectiveness and acceptability." Id. It is worth noting that of the several studies cited in the Notice of Emergency Adoption and Proposed Rule Making, the two included in full in the record actually describe the need for aversive interventions in certain instances. See Dorothy C. Lerman & Christina M. Vondram, On the Status of Knowledge for Using Punishment: Implications for Behavior Disorders, 35 J. APPL. BEHAV. ANAL., 431, 456 (2002) (noting that "punishment is still sometimes needed to reduce destructive behavior to

4

acceptable levels"); Sarah-Jeanne Salvy et al., Contingent Electric Shock (SIBIS) and a Conditioned Punisher Eliminate Severe Head Banging in a Preschool Child, 19 BEHAV. INTERVENT. 59, 70 (2004) (noting that ABIs "can sometime be necessary, although not sufficient, to eliminate severe and harmful [self-injurious behavior] in the natural environment"). Consequently, I am unpersuaded that the Notice of Emergency Adoption and Proposed Rule Making cited by the majority provides a sufficient basis for upholding the district court's dismissal.

Of course, like the majority, I am "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Cerra, 427 F.3d at 192. However, it seems to me that the appropriate course would be to return this action to the district court, which could then review a fuller record, beyond the pleadings, to assess the regulation and its compliance with the IDEA. If my cursory review of the literature in the field is any indication, it seems likely that Appellees will be able to demonstrate that "the regulations represent an informed, rational choice between two opposing schools of thought on

5

the use of aversives," <u>Alleyne v. N.Y. State Educ. Dept.</u>, 691 F. Supp. 2d 322, 333 (N.D.N.Y. 2010), and that Appellants will therefore have difficulty overcoming the "substantial deference" accorded to the review of state policy-making agencies, <u>Wasser v. N.Y. State Office of Voc. & Educ. Servs. for Individuals With Disabilities</u>, 602 F.3d 476, 477 (2d Cir. 2010). Nevertheless, while the outcome may ultimately be the same, it is important that the result be based on a careful assessment of the merits, founded on a well-developed record. In my view, the district court's dismissal – and the majority's affirmance – takes an unnecessary short cut to reach an outcome that cannot be justified at this stage of the proceedings. For these reasons, I respectfully dissent.