*13-1503-cv*

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2013
No. 13-1503-cv

NANCY J. SHERMAN,
*Plaintiff-Appellant*,

*v.*

TOWN OF CHESTER,
*Defendant-Appellee.*[*]

---

Appeal from the United States District Court
for the Southern District of New York.
No. 12-cv-647 — Edgardo Ramos, *Judge*.

---

ARGUED: MARCH 18, 2014
DECIDED: MAY 16, 2014

---

Before: STRAUB, SACK, and LOHIER, *Circuit Judges*.

---

[*] The Clerk of Court is directed to amend the official caption of this case to conform to the listing of the parties shown above.

Appeal from an order of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*) granting defendant Town of Chester's motion to dismiss plaintiff Steven M. Sherman's complaint.

We hold that Sherman's takings claim was ripe under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). Seeking a final decision from the Town would be futile because the Town used unfair and repetitive procedures to avoid a final decision. Additionally, the "state procedures" prong of *Williamson County* is satisfied because the Town removed the case from state court. Sherman also adequately alleged a taking. Accordingly, we **REVERSE** that part of the District Court's decision that dismissed Sherman's takings claim.

We **VACATE** the District Court's decision to dismiss Sherman's federal non-takings claims solely on ripeness grounds and to decline to exercise supplemental jurisdiction over Sherman's state claw claims. Finally, we **AFFIRM** the District Court's decision to dismiss certain claims on the merits.

MICHAEL D. DIEDERICH, JR. Stony Point, NY, *for Nancy J. Sherman*.

ANTHONY CARDOSO (Steven C. Stern *on brief*), Sokoloff Stern LLP, Carle Place, NY, *for Town of Chester*

J. David Breemer, Pacific Legal Foundation, Sacramento, CA, *for amicus curiae Pacific Legal Foundation in support of appellant*.

STRAUB, *Circuit Judge*:

Hungry Joe packed up his bags and wrote happy letters home. He had flown the 25 missions required to complete a tour of duty. But things were not so simple on *Catch-22*'s Pianosa island. He soon discovered that Colonel Cathcart had just raised the number of missions to 30, forcing Hungry Joe to unpack his bags and rewrite his happy letters. At the time, Yossarian had flown 23 missions.

The Colonel later increased the number to 35. When Yossarian was just three away from that mark, the number was increased to 40, and then to 45. When Yossarian had 44 missions under his belt, the Colonel made the number 50. And later 55.

When Yossarian reached 51 missions, he knew it was no cause to celebrate: "He'll raise them," Yossarian understood. He appealed to squadron commander Major Major to be exempted from flying his four remaining missions. "Every time I get close he raises them," Yossarian complained. Major Major responded, "Perhaps he won't this time." But of course Yossarian was right. Colonel Cathcart

raised the number to 60, then 65, then 70, then 80, with no end in sight.

Plaintiff Steven M. Sherman must have felt a lot like Yossarian in his decade of dealing with defendant Town of Chester. In 2000, Sherman applied for subdivision approval while he was in the process of buying a nearly 400 acre piece of land for $2.7 million. That application marked the beginning of his journey through the Town's ever-changing labyrinth of red tape. In 2003, the Town enacted a new zoning ordinance, requiring Sherman to redraft his proposed development plan. When he created a revised proposal in 2004, the Town again enacted new zoning regulations. When he created another revised plan in 2005, the Town changed its zoning laws once more. And again in 2006. And again in 2007.

On top of the shifting sands of zoning regulations, the Town erected even more hurdles. Among other tactics, the Town announced a moratorium on development, replaced its officials, and

required Sherman to resubmit studies that he had already completed. When the Town insisted that Sherman pay $25,000 in consultants' fees before he could obtain a hearing, he might have thought, "The Colonel will just raise it again." And he would have been right. After paying the $25,000, he was told he owed an additional $40,000, and that he would also have to respond to a lengthy questionnaire.

By the time this lawsuit was filed, over ten years had passed. In that time, Sherman became financially exhausted – forced to spend $5.5 million on top of the original $2.7 million purchase. The District Court (Edgardo Ramos, *Judge*) ruled that Sherman's claim under the Takings Clause was not ripe under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), because Sherman had not received a final decision on his property and seeking a final decision would not be futile. The court reasoned that while Sherman may have to jump through more

hoops in the future, he had not established that his application would definitely be denied in the end. To Sherman, this must have sounded a lot like: "Perhaps he won't raise the number this time."

We conclude that under these circumstances, Sherman was not required to obtain a final decision from the Town. Sherman's takings claim was ripe and adequately alleged. Accordingly, we **REVERSE** that part of the District Court's decision that dismissed the takings claim, and we **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

The allegations recited below are taken from the complaint, and we assume they are true for the purposes of this appeal.

This case concerns the decade's worth of red tape put in place by the Town of Chester, its Town Board, and its Planning Board. The Town Board is the governing body of the Town, and the Planning Board appears to give at least preliminary approval to development proposals.

In March of 2000, Sherman applied to the Planning Board for subdivision approval so that he could use and develop MareBrook. The proposed project would include 385 units of housing as well as "an equestrian facility, baseball field, tennis courts, clubhouse, on-site restaurant and a golf course that wove through the property." When Sherman completed his purchase of the property in 2001, it was already zoned for residential use. But soon thereafter, Sherman's troubles began.

## I.    The Moratorium

In July 2001, the Town Board announced that it was imposing a six month moratorium on major subdivision approvals retroactive to May 1, 2001. At least two members of the Town Board "expressed the view that the Moratorium was specifically aimed at Plaintiff's MareBrook project." Sherman was the only developer affected even though other projects were similarly situated.

When the six month period expired, the moratorium was extended, which "singularly affected" Sherman. During the

extension, Sherman applied for a "minor" subdivision approval that was permitted under the moratorium. However, the Town still refused to allow Sherman to pursue the application.

Sherman brought suit against the Town in state court, and as a result of the lawsuit, the Town ended the moratorium, but not until January 2003. In other words, the six month moratorium lasted over a year and a half.

## II. Draft Environmental Impact Statement and the First Zoning Change

In October 2003, the Planning Board "deemed complete" Sherman's Draft Environmental Impact Statement ("DEIS"). That determination established that Sherman's application to the Town was satisfactory in form and content.

In 2003, the Town Board approved the first in a series of changes to its zoning regulations. When Sherman learned of the new requirements early the next year, he was assured by the Town Planner, Garling Associates, that he could meet all its requirements

with only "a modest amount of additional work" and that he would soon obtain preliminary approval.

## III.    More Changes to the Zoning Regulations

Approximately five months later, sometime in late May to early June 2004, Sherman finished revising his plan.  But the Town had already amended its zoning regulations.  Garling Associates, which helped write the new regulations, did not tell Sherman about the changes even though it was advising Sherman about complying with the 2003 regulations.  These amendments created several new requirements, further delaying Sherman.

It took him approximately eleven months to once again revise his application.  In May 2005 – five years after he first sought subdivision approval – he finally met with some success.  The Planning Board approved the MareBrook proposal.  But this success was not to last.  The Town Board refused to entertain Sherman's application, despite holding meetings concerning another development.

One month later, the Town amended its zoning law for a third time without informing Sherman in advance. Sherman revised his application again, and in February 2006, the Town for the fourth time changed its zoning law without warning Sherman. Sherman responded by submitting yet another revised plan, this one in March 2007. That same month, the Town changed its zoning for the fifth time, and it once again did not let Sherman know these changes were coming.

Fed up, Sherman filed suit in federal court in May 2008, a precursor to the case before us now.

## IV. Further Obstruction

In November and December of 2008, Sherman resubmitted his MareBrook application and Supplemental DEIS. By this point, over eight years had passed since Sherman first applied for subdivision approval.

### A.    The Town Engineer

In January 2009, the Town Engineer gave Sherman a list of corrections to the 2008 Supplemental DEIS.  As part of that list, the Town Engineer demanded final designs for water and sewer plants.  But Sherman could not submit the final water and sewer designs until other aspects of the plan – like the number and location of the homes – were finalized.  That, in turn, required preliminary approval, which is the very thing he was trying to obtain from the Town Engineer.

A few months later, the Town appointed a new Town Engineer.  The new appointee needed time to get up to speed on MareBrook.  The Town billed Sherman for the expense of having the new Town Engineer review the entire MareBrook project, even though Sherman already paid for the first engineer to conduct that same review.  The new Town Engineer had an entirely new set of questions, concerns, and items for Sherman to address.  Despite that,

for two years the new Town Engineer maintained his predecessor's

requirement regarding sewer and water plant designs.

### B.    The Chairman

In September 2009, Sherman submitted two different versions

of his subdivision proposal.  By now, the proposals had become

much more conventional than his first application, and they did not

include the recreational facilities initially envisioned.

Soon after submitting the proposals, Sherman discovered that

the Planning Board Chairman had been replaced.  The new

Chairman, Don Serotta, was "openly hostile" towards the

MareBrook application and had written letters to the Town in 2001

against the project.

For three months, the Planning Board refused without

explanation to put Sherman's proposals on the agenda.  Then in

December 2009, Serotta explained that Sherman needed to pay

$25,000 in consultants' fees.  Yet Sherman did not receive an invoice

for those fees as required by the Town Code for approximately two months.

Serotta had other demands as well. He required an additional "cluster plan," which would lead to another reworking of Sherman's DEIS. Serotta also insisted that all roads must be twenty-four feet wide instead of thirty feet. This required Sherman to redraw his plans to relocate curbs, drainage, water and sewer mains, and grading.

Later, Serotta canceled Sherman's appearance at the Planning Board's monthly meeting and demanded $40,000 more in consultants' fees. The Planning Board also insisted that Sherman respond to a questionnaire, which required Sherman to provide, among other things, an evaluation of a traffic intersection in the Town of Monroe (located miles away) and the details of a wetlands walking trail crossing that did not cross any wetlands.

Sherman was also required to answer all inquiries by local residents. Some answers to these questions needed to be repeated twenty to forty times because the Planning Board did not permit him to quote a previous answer.

### C. The Town Planner

In September 2010, the Planning Board voted to accept Sherman's DEIS as complete, seven years after his original DEIS was "deemed complete" in October 2003. A few months later, Ted Fink replaced Garling Associates as the Town Planner. Fink requested an additional study regarding traffic on the other side of town, even though Sherman had long before completed that study. Fink also sent monthly lists of demands to Sherman, which included a "wetland study," a "concerted species study," and a "constraints study." The new studies concluded that there were no changes since those same studies were completed in 2003. Fink also required Sherman to redo the DEIS that had just been deemed complete.

## V.  Financial Losses and Subsequent Death

The Town's machinations to prevent the development of

MareBrook were not without their cost.  Between taxes, interest

charges, carrying costs, and expenses, Sherman spent approximately

$5.5 million on top of the original $2.7 purchase price.  As a result,

Sherman became financially exhausted to the point of facing

foreclosure and possible personal bankruptcy.  And while the case

was pending on appeal, Sherman died.  Nancy J. Sherman, his

widow, was substituted for him on appeal as his personal

representative.[2]

## VI.  Procedural History

As already mentioned, in 2008 Sherman filed suit against the

Town and other defendants in federal court.  He brought many of

the same claims that he raises today.  The Town moved to dismiss,

arguing among other things that Sherman's takings claim was not

---

[2] Nancy Sherman was substituted after the briefs were filed.  For this reason, and for the sake of simplicity, we will refer only to Steven Sherman throughout this opinion.

ripe because he had not sought compensation from the state.

Sherman voluntarily dismissed the case and then filed the case now

before us in state court. The Town removed to federal court, where

it once again moved to dismiss in part on ripeness grounds.

The District Court dismissed some of Sherman's federal

claims on the merits, and most because they were unripe. While

acknowledging it was a close case, the District Court concluded that

Sherman had failed to show that seeking a final decision from the

Town would be futile.

Sherman timely appealed.

## DISCUSSION

"We review *de novo* a district court's order granting a motion

to dismiss under Rule 12(b)(6), accepting as true all allegations in the

complaint and drawing all reasonable inferences in favor of the

nonmoving party. To survive a Rule 12(b)(6) motion to dismiss, the

complaint must include enough facts to state a claim to relief that is

plausible on its face. A claim will have facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Dantas*, --- F.3d ---, 2014 WL 866507, at \*2 (2d Cir. Mar. 6, 2014) (internal citations and quotation marks omitted).

Although Sherman brought numerous federal and state claims, the main dispute on appeal concerns Sherman's takings claim, which was dismissed as unripe under the first prong of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). The District Court dismissed most of the other federal claims for the same reason, and some of them, in the alternative, for failure to state a claim. Finally, the District Court declined to exercise supplemental jurisdiction over Sherman's state law claims.[3]

---

[3] The District Court also dismissed Sherman's freedom of religion and right to association claims as frivolous. Sherman has not challenged that ruling on appeal.

## I.  Takings Claim and *Williamson County* Ripeness

We evaluate the ripeness of a takings claim under the two prong test established by the Supreme Court in *Williamson County*. For the claim to be ripe, the plaintiff must "show that (1) the state regulatory entity has rendered a 'final decision' on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).

"Because *Williamson County* is a prudential rather than a jurisdictional rule, we may determine that in some instances, the rule should not apply and we still have the power to decide the case."  *Sansotta v. Town of Nags Head*, 724 F.3d 533, 545 (4th Cir. 2013); *see also Horne v. Dep't of Agric.*, 133 S.Ct. 2053, 2062 (2013) (recognizing that *Williamson County* "is not, strictly speaking, jurisdictional"); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733-34 (1997) (describing the *Williamson County* prongs as "two independent prudential hurdles").

### A.    The Final Decision Prong

Sherman concedes that the Town has not reached an official final decision.  He argues instead that he does not need to meet this requirement because seeking a final decision would be futile.

"[T]he finality requirement is not mechanically applied.  A property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile.  That is, a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied."  *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005).

Additionally, "[g]overnment authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001); *see also MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 350 n.7 (1986) ("A property owner is of

course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain this determination.").

While these two exceptions to the finality requirement – futility and unfair/repetitive procedures – are distinct concepts, in this case, the analyses for the two are the same. Sherman argues that seeking a final decision would be futile because the Town used – and in all likelihood will continue to use – repetitive and unfair procedures in order to avoid a final decision.

The final decision requirement "follows from the principle that only a regulation that 'goes too far,' results in a taking under the Fifth Amendment." *Suitum*, 520 U.S. at 734 (internal citations omitted). Normally, "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald*, 477 U.S. at 348. However, in this case, Sherman is not challenging any one regulation. Rather, he argues that the repeated zoning changes and other roadblocks – the "procedure he

had to endure" – constituted a taking. *See* Appellant's Brief at 27. A final decision is not necessary to evaluate whether that obstruction itself constituted a taking.

In *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, the Ninth Circuit ruled that seeking a final decision would be futile under similar circumstances. 920 F.2d 1496, 1506 (9th Cir. 1990). In that case, the property owners submitted a proposal to develop their property with 344 residential units. *Id.* at 1502. The plan was denied by the planning commission, and the city planners stated that a proposal with 264 units would be received favorably. *Id.* When the owners submitted a new 264-unit plan, it was denied, and the city planners this time stated that a proposal with 224 units would be received favorably. *Id.* When the owners submitted a new 224-unit plan, it was denied as well. *Id.* That decision was appealed to the city council, which referred the project back to the planning commission with a request that it consider a 190-unit plan. *Id.* The

owners submitted a new 190-unit plan, which was also denied. *Id.*

The owners once again appealed to the city council, which approved

the plan so long as fifteen conditions were met. *Id.* at 1503. The

owners submitted a new plan which substantially met those

conditions. That too was denied by both the planning commission

and the city council. *Id.* at 1504, 1506. Yet none of this constituted a

"final decision."

The Ninth Circuit ruled that the property owners did not need

to meet the final decision prong of *Williamson County*. *Id.* at 1506.

The court reasoned that "[r]equiring [the owners] to persist with this

protracted application process to meet the final decision

requirement would implicate the concerns about disjointed,

repetitive, and unfair procedures expressed in *MacDonald* . . . ." *Id.*

(internal citations omitted).

Requiring Sherman to persist with a similar protracted

application process would implicate these same concerns. For years,

every time Sherman submitted or was about to submit a proposal for MareBrook, the Town changed its zoning regulations, sending Sherman back to the drawing board. It retroactively issued a six month moratorium on development that appears to have applied only to Sherman's property. That six month moratorium was extended for another year until after Sherman sued the Town. Town officials also repeatedly asked Sherman to resubmit studies and plans that had already been approved.

The District Court adopted a narrower view of futility than the Ninth Circuit's: that while "the ripeness doctrine does not require litigants to engage in futile gestures such as to jump through a series of hoops, the last of which is certain to be obstructed by a brick wall, the presence of that brick wall must be all but certain for the futility exception to apply." *Sherman v. Town of Chester*, No. 12 Civ. 647, 2013 WL 1148922, at \*9 (S.D.N.Y. Mar. 20, 2013) (internal alteration omitted). Applying that standard to our case, the court

below concluded, "Here, all that is known is that Plaintiff has jumped through many hoops – more, perhaps, than sound policy should require – and there are one or more hoops in the future. The inference that there is a brick wall at the end is hard to establish, and it is not established here, though it is a close case." *Id.*

This analysis does not account for the nature of the Town's tactics. The Town will likely never put up a brick wall in between Sherman and the finish line. Rather, the finish line will always be moved just one step away until Sherman collapses. In essence, the Town engaged in a war of attrition with Sherman. Over ten years, Sherman was forced to spend over $5.5 million on top of the original $2.7 million purchase. As a result, he became financially exhausted to the point of facing foreclosure and possible personal bankruptcy. Moreover, at no point could Sherman force the Town to simply give a final "yay or nay" to his proposal. When asked at argument, the Town's counsel could not name one way Sherman could have

appealed any aspect of the Town's decade of maneuvers in order to obtain a final decision. *See* Oral Arg. Tr. at 21:20-22:9.

"We are mindful that federal courts should not become zoning boards of appeal . . . ." *Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir. 1986). Every delay in zoning approval does not ripen into a federal claim. Unfortunately, it is no simple task to distinguish procedures that are merely frustrating from those that are unfair or would be futile to pursue. But when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, the high standard is met.

And it was met in this case. Seeking a final decision would be futile because the Town used – and will in all likelihood continue to use – repetitive and unfair procedures, thereby avoiding a final decision. Sherman is therefore not required to satisfy the first prong of *Williamson County*. This conclusion is consistent with the principles behind *Williamson County*. The final decision requirement

ensures that a court knows how far a regulation goes before it is asked to determine whether that regulation "goes too far." In this case, we are not dealing with any one regulation but the Town's decade of obstruction. A final decision is not necessary to evaluate whether that obstruction was itself a taking.

### B.    State Procedures Prong

Under the second prong of *Williamson County*, a plaintiff's claim is ripe only if the "plaintiff has sought just compensation by means of an available state procedure." *Dougherty*, 282 F.3d at 88.

While *Williamson County* prevents a plaintiff from bringing his takings claim in federal court before first seeking compensation from the state, it "does not preclude state courts from hearing simultaneously a plaintiff's request for compensation under state law and the claim that, in the alternative, the denial of compensation would violate the [Takings Clause of the] Fifth Amendment of the Federal Constitution." *San Remo Hotel, L.P. v. City and Cnty. of S.F.*, 545 U.S. 323, 347 (2005). This is because "[r]eading *Williamson*

*County* to preclude plaintiffs from raising such claims in the alternative would erroneously interpret [the Supreme Court's] cases as requiring property owners to 'resort to piecemeal litigation or otherwise unfair procedures.'" *Id.* (quoting *MacDonald*, 477 U.S. at 350 n.7).

Sherman first brought suit against the Town in federal court in 2008. The Town argued that the takings claim was unripe in part because Sherman had not alleged that he sought and was denied just compensation by an available state procedure. Sherman voluntarily dismissed the case, and followed *San Remo* by filing his federal takings claim and his state law claim for compensation in state court. The Town then removed the case from state court to federal court, where it argued once again that the takings claim must be dismissed because it can be heard only in state court under *Williamson County*.

In *Sansotta v. Town of Nags Head*, 724 F.3d 533 (4th Cir. 2013), the Fourth Circuit concluded that when the defendant removes a

takings claim to federal court, the state procedures prong of *Williamson County* does not apply. We agree with that court's reasoning that "refusing to apply the state-litigation requirement in this instance ensures that a state or its political subdivision cannot manipulate litigation to deny a plaintiff a forum for his claim." *Id.* at 545.

The removal maneuver prevents Sherman from litigating his federal takings claim until he finishes litigating his state law claim for compensation. In other words, it prevents Sherman from pursuing both claims simultaneously, no matter what forum they are brought in. This runs against *San Remo*, which allows plaintiffs to do just that. In other words, the removal tactic can "deny[ ] a plaintiff *any* forum for having his claim heard," or at least force the plaintiff into the kind of piecemeal litigation that, under *San Remo*, cannot be required. *See id.* at 547.

We conclude that when a defendant removes a takings claim from state court to federal court, the second prong of *Williamson County* is satisfied. Sherman's takings claim is ripe, and we may address the merits.

### C.    Merits of the Takings Claim

"The law recognizes two species of takings: physical takings and regulatory takings." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006). This case concerns a regulatory taking, which occurs "when the government acts in a regulatory capacity." *Id.* "The gravamen of a regulatory taking claim is that the state regulation goes too far and in essence 'effects a taking.'" *Id.*

"Regulatory takings are further subdivided into categorical and non-categorical takings." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 n.2 (Fed. Cir. 2008). A categorical taking occurs in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002).

"Anything less than a complete elimination of value, or a total loss," is a non-categorical taking, which is analyzed under the framework created in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Tahoe-Sierra*, 535 U.S. at 330 (internal quotation marks omitted).

In *Tahoe-Sierra*, the Supreme Court advises three times to "resist the temptation to adopt what amount to *per se* rules" for regulatory takings. *Id.* at 326; *see also id.* at 321, 342. In that case, the Court addressed whether temporary moratoria on development constituted a taking. *Id.* at 321. It concluded that the answer was "neither 'yes, always' nor 'no, never.'" *Id.* The Court therefore rejected a categorical taking analysis and decided that issue was "best analyzed within the *Penn Central* framework." *Id.*

We follow the Supreme Court's guidance to resist *per se* rules. Like the temporary moratoria at issue in *Tahoe-Sierra*, evaluating the type of obstruction at issue here is not susceptible to a yes-always or

no-never categorical approach. We will therefore analyze Sherman's

takings claim within the *Penn Central* framework. We will then

consider the Town's argument that the claim is time barred. And

because we conclude under the non-categorical method that

Sherman has stated a claim that the Town effected a taking, we need

not decide the issue under the categorical approach.

### 1.    Non-Categorical Taking and *Penn Central*

The *Penn Central* analysis of a non-categorical taking "requires

an intensive *ad hoc* inquiry into the circumstances of each particular

case." *Buffalo Teachers Fed'n,* 464 F.3d at 375. "We weigh three

factors to determine whether the interference with property rises to

the level of a taking: (1) the economic impact of the regulation on the

claimant; (2) the extent to which the regulation has interfered with

distinct investment-backed expectations; and (3) the character of the

governmental action." *Id.* (internal quotation marks omitted).

Sherman's claim passes this test.

First, the Town's actions effectively prevented Sherman from making any economic use of his property. New studies were demanded after they were already completed; new deficiencies in Sherman's proposals were found after they were already approved; new fees were required after they had already been paid; and new regulations were created when Sherman complied with what had previously been required. Because the Town kept stringing him along, Sherman could never develop his property. The Town won its war of attrition.

Second, the Town interfered with Sherman's reasonable investment-backed expectations, "a matter often informed by the law in force in the State in which the property is located." *Ark. Game & Fish Comm'n v. United States*, 133 S.Ct. 511, 522 (2012). When Sherman bought MareBrook, it was already zoned for residential use. His reasonable expectation, therefore, was that he would begin recouping that investment after a reasonable time to get the Town's

approval on at least some form of development. He could not have expected the Town's decade of obstruction that pushed him to the brink of bankruptcy.

The third factor – the character of the government action – is the most elusive. *See* John D. Echeverria, *Making Sense of Penn Central*, 23 UCLA J. ENVTL. L. & POL'Y 171, 186-99 (2005) (outlining nine possible definitions of "character"); Thomas W. Merrill, *The Character of the Governmental Action*, 36 VT. L. REV. 649, 661-71 (2012) (outlining six "themes or ideas" considered by courts when evaluating "character").

In *Penn Central* itself, the Court stated that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (internal citation omitted). In this case, the Town's

actions are not part of a public program adjusting the benefits and burdens of public life. Rather, the Town singled out Sherman's development, suffocating him with red tape to make sure he could never succeed in developing MareBrook. The Town's alleged conduct was unfair, unreasonable, and in bad faith. Though the precise contours of the "character" factor may be blurry, we can nevertheless conclude that the Town's conduct in this case falls safely within its ambit.

Balancing the *Penn Central* factors, we conclude that Sherman stated a non-categorical takings claim.

### 2. Statute of Limitations

The Town argues that Sherman's takings claim is barred by 42 U.S.C. § 1983's statute of limitations, which the parties do not dispute is three years in this case. *See Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997). According to the Town, in evaluating whether Sherman stated a claim, we should have considered only what occurred in the three years before the complaint was filed.

But that argument would mean that a government entity could engage in conduct that would constitute a taking when viewed in its entirety, so long as no taking occurred over any three-year period. We do not accept this. The Town used extreme delay to effect a taking. It would be perverse to allow the Town to use that same delay to escape liability.

The only way plaintiffs in Sherman's position can vindicate the Supreme Court's admonition in *Palazzolo* that government authorities "may not burden property by imposition of repetitive or unfair land-use procedures" is to allow to them aggregate acts that are not individually actionable. *See* 533 U.S. at 621. A claim based on such a "death by a thousand cuts" theory requires a court to consider the entirety of the government entity's conduct, not just a slice of it.

In fact, in support of the prohibition on repetitive and unfair procedures, the Supreme Court cited a case much like the one before

us: *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999). That case, already described above in more detail, involved nineteen different site plans and five formal decisions over five years. *Id.* at 698. City planners kept demanding proposals with fewer residential units after the property owners complied with the previous demand. *Id.* at 695-98; *see also Tahoe-Sierra*, 535 U.S. at 333-34 (citing *Del Monte Dunes* and suggesting that delay in bad faith could support a takings claim).

In *National Railroad Passenger Corp. v. Morgan*, the Supreme Court allowed hostile work environment claims to similarly be evaluated in their entirety. 536 U.S. 101 (2002). In that situation, the "unlawful employment practice . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years . . . ." *Id.* at 115 (internal quotation marks omitted). And each act that makes up the unlawful conduct is likely not actionable on its own. *Id.* As a result, the Supreme Court concluded, hostile work

environment claims are timely "so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105.

Although this way of applying a statute of limitations is generally used in the employment discrimination context, we have not limited it to that area alone. *See Shomo v. City of New York*, 579 F.3d 176, 181-82 (2d Cir. 2009) (concluding that the "continuing violation doctrine" can apply to Eighth Amendment deliberate indifference claims); *see also Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (per curiam) (concluding that for Equal Protection claims brought under § 1983, "[w]here a plaintiff challenges a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it" (internal quotation marks omitted)).

Here, Sherman's claim is based on an unusual series of regulations and tactical maneuvers that constitutes a taking when considered together, even though no single component is unconstitutional when considered in isolation. As in the context of the cases described above, it cannot be said that Sherman's property was "taken" on any particular day. But because Sherman alleges that at least one of the acts comprising the taking occurred within three years of filing the case, his claim is not time barred. We therefore need not reach the issue of whether the limitations period is tolled under 28 U.S.C § 1367(d).

## II. Other Federal Claims

The District Court ruled that other federal claims were unripe for the same reason it concluded Sherman's takings claim was unripe. Because we have determined that Sherman's takings claim was, in fact, ripe, the District Court's ruling can no longer stand. Therefore, for the federal non-takings claims that were dismissed

solely on ripeness grounds, the District Court should consider on remand whether Sherman stated a claim.

Some claims, however, the District Court dismissed for failure to state a claim. They were (A) claims under 42 U.S.C. §§ 1981 and 1982; and (B) a procedural due process claim based on the Town's consultants' fee law. Those claims were properly dismissed.

### A. Section 1981 and Section 1982 Claims

The District Court concluded that Sherman did not state a claim based on § 1981, and it denied as futile Sherman's request to add a claim under 42 U.S.C. § 1982 for the same reasons it dismissed the § 1981 claim. *See Sherman*, 2013 WL 1148922, at *6 n.6.

For both claims, Sherman must allege facts supporting the Town's intent to discriminate against him on the basis of his race. *See Rivera v. United States*, 928 F.2d 592, 607-08 (2d Cir. 1991). Jews are considered a race for the purposes of §§ 1981 and 1982. *United States v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002).

Sherman's allegations that the Town discriminated against him because he was Jewish are insufficient. He states that the "municipal Defendants" knew that he was Jewish, and that at a Town Board meeting, he heard Town citizens express fear that MareBrook might become a "Hassidic Village" like the nearby Kiryas Joel. He also alleges that a "model home was vandalized with a spray-painted swastika." However, none of this is linked to any Town official. Nor does he allege that any similarly situated non-Jews were treated differently. Therefore, the District Court correctly dismissed the § 1981 claim and denied Sherman leave to amend to add the § 1982 claim.

### B. Due Process Challenge to Consultants' Fee Law

The District Court also properly dismissed Sherman's claim that the Town's imposition of its consultants' fee law did not provide sufficient procedural due process. Town Code § 48-3 provides that an applicant for approval of any land development proposal shall reimburse the Town's reasonable fees. Pursuant to

§ 48-5(A), "[a]n applicant may appeal, in writing, to the Town Board for a reduction in the required reimbursement amount." The appeal must be filed within fifteen days from the delivery of the voucher itemizing the services performed and the amount charged for those services. §§ 48-5(B); § 48-3(K)-(L). The itemized voucher is accompanied by a notice, informing the applicant of these requirements. § 48-3(L).

Sherman makes two arguments in support of his due process claim.[4] First, he argues that "the Town did not provide Sherman with actual notice of what he was being asked to pay for . . . ." Appellant's Brief 58. However, the complaint states that while he initially did not receive invoices for the required consultants' fees,

---

[4] Sherman's arguments in support of the due process claim raised for the first time in his reply brief are waived. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief."). We also do not consider Sherman's argument that the provisions in question violated New York law because the District Court declined to exercise supplemental jurisdiction over that claim.

"the Planning Board eventually provided Plaintiff with its consultants' invoices . . . ."

Sherman also argues that the Town did not "allow a pre-deprivation hearing when he complained . . . ." Appellant's Brief 58-59. However, Sherman did not object to the fees in the 15 days required by § 48-5(A). He received the invoice for the $25,000 fee in February 2010. He paid the fee in March of that year. He did not did not appeal the fee until June 24, 2011 – over a year after the he received the invoices.[5]

In short, Sherman does not allege that he was not provided with an opportunity to be heard. Rather, he alleges that he did not take advantage of that opportunity. "[I]f reasonable notice and

---

[5] The complaint also references a "timely filed" appeal in 2010. However, the complaint explicitly states that Sherman filed the appeal on June 24, 2011 and does not otherwise mention a 2010 appeal. "Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the [c]omplaint." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, ---F.3d---, 2014 WL 1244184, at *6 (2d Cir. Mar. 27, 2014) (internal citation and quotation marks omitted). Moreover, the appeal's timeliness is a legal conclusion that we need not accept as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

opportunity for a hearing are given, due process will be satisfied, regardless of . . . whether the owner takes advantage of the opportunity for a hearing." *Brody v. Vill. of Port Chester*, 434 F.3d 121, 131 (2d Cir. 2005); *see also Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 708-09 (2d Cir. 1985) (rejecting procedural due process challenge to the imposition of costs and attorney's fees because the party had an opportunity to be heard "but failed to take advantage of the opportunity"). The District Court therefore properly dismissed this claim.

## III. State Law Claims

The District Court declined to exercise supplemental jurisdiction over Sherman's state law claims on the ground that it had dismissed all of his federal claims. Because Sherman stated at least one federal claim, we also vacate the District Court's decision to remand the state law claims to state court.

## CONCLUSION

Because of the way the Town handled Sherman's MareBrook proposal and subsequent litigation, Sherman's claim became ripe. According to the allegations in the complaint, which we take as true for these purposes, the Town employed a decade of unfair and repetitive procedures, which made seeking a final decision futile. The Town also unfairly manipulated the litigation of the case in a way that might have prevented Sherman from ever bringing his takings claim. It removed the case from state court, and then moved to dismiss on the ground that the takings claim must be heard in state court. We cannot accept this tactic. Throughout it all, the Town prevented Sherman from developing his land. Had the Town acted more reasonably, the claim may never have become ripe, and no taking may ever had occurred. We **REVERSE** the District Court's decision to dismiss Sherman's federal takings claim.

Because the *Williamson County* ripeness requirements are satisfied, we **VACATE** the District Court's decision to the extent it

dismissed Sherman's federal non-takings claims solely on ripeness grounds. On remand, the District Court may consider whether Sherman has sufficiently stated those claims.

We **AFFIRM** the District Court's decision (1) to dismiss Sherman's § 1981 claim, (2) to deny Sherman leave to amend to add a § 1982 claim, and (3) to dismiss Sherman's procedural due process claim based on the consultants' fee law.

Because at least one federal claim has been stated, we **VACATE** the District Court's decision to decline to exercise supplemental jurisdiction over Sherman's state law claims on the ground that all the federal claims had been dismissed. On remand, the District Court may reconsider whether to exercise supplemental jurisdiction in light of the new posture of the case.

We **REMAND** to the District Court for further proceedings consistent with this opinion.